UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

**MICHAEL HARRIS,**

        **Plaintiff,**

**v.**                                            **No. SA-18-CV-1023-JKP**

**CITY OF SCHERTZ,**

        **Defendant.**

## MEMORANDUM OPINION AND ORDER

Before the Court is *Defendant City of Schertz' Motion for Summary Judgment*. ECF No. 15. Upon consideration of the motion, response, reply, summary judgment evidence, and the relevant law, the Court concludes the City's motion shall be GRANTED.

## BACKGROUND

In his First Amended Complaint ("Complaint"), Michael Harris ("Harris") asserts the City of Schertz (the "City") discriminated against him based on his sex and his age in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII") and the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. ("ADEA"). Harris alleges that after an investigation into the Animal Services Department he was terminated while a younger female employee was not, even though each was found to have engaged in inappropriate behavior or taken inappropriate actions. ECF No. 9, pars. 7-13.

Harris began his employment with the City of Schertz in May 1989. His tenure began as a Patrol Officer with the Police Department where he was promoted several times, eventually becoming Interim Chief and then Assistant Chief before being appointed City Marshal on

February 1, 2014. As City Marshal, Harris headed the departments of the City Marshal, Animal Services, and Environmental Health.

When Harris assumed the role of City Marshal, he was aware that Animal Services had a high rate of turnover and that there was conflict among its employees. ECF Nos. 15 at 4; 17 at 3. In December 2016, allegations of misconduct were made against Animal Services employee David Taylor ("Taylor"). An investigation ensued resulting in the resignation of Animal Services manager Shanna O'Brien ("O'Brien") and the termination of Taylor and Harris. ECF No. 15-1 at 155 (Harris termination letter). Harris appealed his termination. ECF No. 15-4 at 112-17. It was upheld by the city manager on July 12, 2017. ECF No. 15 at 3.

On October 12, 2017, Harris filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that the City discriminated against him on the basis of his sex, male, and his age, 55. The notice of right to sue issued on July 17, 2018. ECF No. 9, par. 13. Harris filed this lawsuit on October 1, 2018. ECF No. 1. The City of Schertz now seeks summary judgment on both claims.

## LEGAL STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Rodriguez v. Pacificare, Inc.*, 980 F.2d 1014, 1019 (5th Cir. 1993).[1] "[T]he substantive law will identify which facts are material," and a fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

---

[1] Although 2010 amendments replaced "issue" with "dispute," the summary judgment standard "remains unchanged." Fed. R. Civ. P. 56 advisory committee notes (2010 amend.).

(1986). A dispute is "genuine" where there is sufficient evidence such that a reasonable jury could return a verdict for the nonmoving party. *Id*. Because there must be a genuine dispute of material fact, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id*. at 247-48. There is no genuine dispute for trial when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). While all evidence and reasonable inferences are viewed in the light most favorable to the nonmovant, and all disputed facts are resolved in favor of the non-movant, the judge's function "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson*, 477 U.S. at 249); *see also Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 234 (5th Cir. 2016).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp.*, 477 U.S. at 323. To meet its initial burden, the moving party must either: (1) present evidence that negates the existence of some material element of the nonmoving party's claim; or (2) point out the nonmoving party lacks sufficient evidence to prove an essential element of its claim. *Id*.; *McKee v. CBF Corp.*, 299 F. App'x 426, 428 (5th Cir. 2008). To do so, the moving party must identify the portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits that demonstrate the absence of a triable dispute of material fact. *Celotex Corp.*, 477 U.S. at 323; *Union Planters Nat'l Leasing v. Woods*, 687 F.2d 117, 121 (5th Cir. 1982).

If the movant carries that initial burden, the burden shifts to the nonmovant to identify specific facts or present competent summary judgment evidence showing the existence of a genuine fact dispute. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87; *see also* Fed. R. Civ. P. 56(c). Courts have "no duty to search the record for material fact issues." *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. In other words, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Heinsohn*, 832 F.3d at 234. The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* [dispute] of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original).

## DISCUSSION

Harris alleges the City terminated his employment because of his sex, male, and his age. ECF No. 9, pars. 14-15. Title VII prohibits discrimination based on race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). The ADEA prohibits discrimination based on age. 29 U.S.C. § 623(a)(1).

The *McDonnell Douglas* burden-shifting framework applies to both Title VII and ADEA claims. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Bauer v. Albemarle Corp.*, 169 F.3d 962, 966 (5th Cir. 1999). *McDonnell Douglas* requires an employee to first establish a *prima facie* case of discrimination. 411 U.S. 792 at 802.

To establish a *prima facie* case of discrimination based on sex, a plaintiff must demonstrate: (1) he is a member of a protected class, (2) he was qualified for the position held, (3) he was subject to an adverse employment action, and (4) he was replaced by someone outside

of his protected class or others similarly situated, but not in the protected class, were treated more favorably. *Gilbert v. Brookshire Grocery Co.*, 354 F. App'x 953, 954 (5th Cir. 2009); *Okoye v. Uni. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512-13 (5th Cir. 2001).

To establish a *prima facie* case of age discrimination, a plaintiff must demonstrate that he was: "(1) terminated; (2) qualified for the position from which he was terminated; (3) within the protected age group at the time of termination; and (4) replaced by someone younger or outside the protected class, or otherwise discharged because of his age." *Chester v. DirecTV, L.L.C.*, 683 F. App'x 344, 346-47 (5th Cir. 2017).

If the employee establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for terminating the employee. *McDonnell*, 411 U.S. at 802. This burden is one of production, not persuasion. *Texas Dept. of Community Affairs* v. *Burdine*, 450 U. S. 248, 254 (1981). The employer meets the burden with evidence that clearly sets forth the reason for termination. *Id.* at 255.

Under Title VII, the employee can refute the employer's showing with evidence sufficient to create a genuine dispute of material fact that the employer's proffered reason for termination is pretextual or that the explanation is only one reason for the termination and another "motivating factor" is the employee's protected characteristic. *Rachid v. Jack in the Box*, 376 F.3d 305, 312 (5th Cir. 2004). "Sufficient evidence" in this context means the employee must "prove by a preponderance of the evidence that the legitimate reasons offered by [the employer] were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. Under the ADEA, the employee must present evidence capable of proving that age was the "but for" cause of the adverse employment action. *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 177-78 (2009); *Babb v. Wilkie*, 140 S. Ct. 1168, 1176 (2020).

In its motion, the City does not challenge the first three prongs of Harris's *prima facie* cases. It contends that Harris cannot establish the fourth prongs because he cannot establish that he was terminated based on his age given that he was a white male in his fifties fired by a white male in his fifties, and he cannot establish he was terminated based on sex because his comparator, Shanna O'Brien, was his subordinate and both O'Brien and Harris were considered for demotion. ECF No. 15 at 7-8. In its reply, the City focuses its argument on pretext, arguing that Harris cannot rebut its reason for terminating him, stating that Harris was fired because he had a "surreptitious" camera installed in a vent in order to surveille Animal Services employees. ECF No. 18 at 1-3.

With respect to his *prima facie* case for sex discrimination, Harris argues that O'Brien, a younger female employee was treated more favorably.

In late December 2016, Harris told his supervisor, Executive Director of Operations, Dudley Wait ("Wait"), about an issue in Animal Services with Taylor that had been brought to his attention by O'Brien. ECF Nos. 15-1 at 21-23 (19:22-21:23); 17 at 3. As Taylor was then scheduled for vacation, Harris decided to speak with Taylor when he returned. ECF Nos. 15-2 at 23 (21:4-6); 15-4 at 99. In the meantime, Harris suggested O'Brien obtain written statements from the employees who had complained about Taylor's behavior. Animal Services employees Megan Lagunas and Debbie Hernandez submitted statements on December 29 and 30 respectively. ECF No. 15-4 at 23 (21:17-22:10), 93. On January 17, 2017, Taylor submitted to Harris a list of issues, concerns, and personal observations. On January 18, 2017, Harris emailed these items to Human Resources Director Jessica Kurz[2] ("Kurz"). ECF Nos. 17-3 at 2; 15-1 at 23

---

[2] At all times relevant to this case, Jessica Kurz and Michael Harris reported to Dudley Wait. ECF Nos. 15-1 at 13-14; 15-4 at 13 (11:14-22).

(21:4-6); 15-4 at 93-96. That same day, Ms. Lagunas submitted a second, signed statement. ECF No. 15-4 at 94.

Kurz and Wait had a conversation with the city attorney and the city manager and developed a plan to execute an investigation into the "going-ons" at Animal Services. ECF Nos. 15-1 at 33-34 (31:11-32:17); 15-4 at 24-25 (22:12-19; 23:1-2). Kurz and Wait's deposition testimony conflicts as to whether the investigation was being made into Animal Services or Animal Services and Harris. Kurz testified that at that time they were not investigating any complaint about Harris. ECF No. 15-4 at 26 (24:8-10). Wait testified that he believed the investigation included looking into O'Brien's allegations about Harris from the "get-go." ECF No. 15-1 at 34 (32:5-25). On January 19, 2017, a "group meeting" was held with Animal Services employees to announce the commencement of an investigation "into highly inappropriate comments being made." ECF No. 15-4 at 100. Each employee then completed "a questionnaire regarding the environment, use of inappropriate language and inappropriate behavior." *Id.* The employees were told to contact HR, if they "felt like someone was being retaliatory." *Id.*

On January 27, 2017, O'Brien sent an e-mail to Kurz, stating that after she had spoken to Harris about Taylor's behavior in December of 2016, Lesa Wood ("Wood"), another City employee, told her that Harris went into Wood's office and watched O'Brien walk to her City vehicle. According to O'Brien's e-mail, Harris told Wood he was having "employee issues," and, according to Wood, lingered around her office staring out the window. O'Brien concluded: "I assure you it was to see if I was going to HR." ECF No. 17-4 at 2. The evidence does not corroborate O'Brien's suspicion that Harris was watching to see if she was going to HR. *See* ECF No. 15-4 at 47-50 (45:20-48:14) (in which Kurz equivocates about what Wood told her

about Harris's alleged visit to her office). Harris denied O'Brien's allegation that he watched to see where she was going. ECF Nos. 15-1 at 27-29 (25:4-27:15); 15-2 at 30 (28:3-22). Kurz testified in deposition that as of December of 2016, when she first became aware that employees in Animal Services were unhappy about their working conditions, no one had made any complaint about how Harris was responding to the discontent. ECF No. 15-4 at 15 (13:21-23; 14:3-15:6).

During the investigation, the Animal Services employees levied many allegations of misconduct against Taylor and O'Brien and made no allegations of misconduct against Harris. ECF Nos. 17-5; 17-6; 15-4 at 28-29 (26:23-27:19). After O'Brien was served a notice of complaint, she began making allegations of misconduct by Harris. ECF Nos. 17-6 at 46-56; 15-4 at 40-47. Kurz was asked in deposition, "did any of the other Animal Services employees confirm or corroborate what Ms. O'Brien was saying about Mr. Harris?" ECF No. 15-4 at 44 (42:9-11). She replied, "I can't recall without reviewing the meeting transcripts." *Id.* (42:12-13). The Court read the complaints, the questionnaires, and the transcripts submitted with the summary judgment evidence. ECF Nos. 17-3, 17-5, 17-6. With the exception of O'Brien's January email, no negative allegations were made about Harris by any employee prior to March 8, 2017. After March 8, the only employee to disparage Harris or make allegations against him was O'Brien and none of the other Animal Services employees confirmed or corroborated her allegations. ECF No. 17-6 at 50-53, 56. Even though the allegations made by O'Brien spoke to Harris's character, demeanor, and communication style, the six other employees in Harris's reporting structure (those in warrants, court security, and code enforcement) were not interviewed. ECF Nos. 15-1 at 16; 15-2 at 14-15. The evidence also shows that O'Brien had

several discipline issues during her ten-year tenure while Harris had none in twenty-eight years with the City. ECF No. 17-2 at 2-14.

In early May 2017, Wait and Kurz decided to demote both Harris and O'Brien. In making their decision, Wait and Kurz considered the allegations made against Harris and O'Brien, their length of time with the City, previous performance, and their disciplinary histories. ECF No. 15-1 at 54 (52:7-14), 127 (125:20-24). Consequently, a reasonable juror could conclude that O'Brien was treated more favorably. However, as the City points out, O'Brien is not an appropriate comparator. ECF No. 15-1 at 146.

A comparator must hold the same job or job responsibilities as the Title VII claimant. A coworker that shares the same supervisor as the Title VII claimant or who has his or her employment status determined by the same person and who has a similar history of "violations" or "infringements" may serve a comparator for the claimant. *Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 426 (5th Cir. 2017). Applying this definition, any of the city employees that reported directly to Executive Director Wait and had a similar work history as Harris might be similarly situated to Harris. For example, if Myles Clauser, Director of Information Technology for the City of Schertz, is not a white male, he would be an appropriate comparator because he, like Harris, reported to Wait, he was responsible for procuring the camera and directing its placement (discussed below), and he was not terminated. O'Brien, because she reported to Harris, is not similarly situated to Harris. Therefore, she is not an appropriate comparator. Thus, Harris has not shown that a similarly situated employee outside his protected class was treated more favorably.

As a final note to Harris's Title VII arguments, as stated above, O'Brien and Harris were both slated for demotion. *See* ECF No. 15-5 (draft demotion notices for O'Brien and Harris dated

May 3, 2017). On the day she was called in to be served notice of demotion, May 19, 2020, O'Brien resigned. *See* ECF No. 15-1 at 57:10-59:15, 148 (O'Brien demotion notice); 150 (O'Brien letter of resignation). Harris contends that O'Brien was "allowed" to resign and he was "never offered that option." ECF No. 17 at 21. Wait testified in deposition that O'Brien handed over her letter of resignation as he and Kurz were explaining the notice of demotion: "she stopped us and handed us her letter of resignation." ECF Nos. 15-1 at 58:17-59:6; 15-4 at 82 (80:4-11). Thus, it appears that O'Brien was not offered the option to resign but chose to resign before her demotion took effect.

Harris's *prima facie* case for age discrimination fares better. The City contends by failing to directly address the ADEA claim in his response, Harris has abandoned it. ECF No. 18 at 2. The Court disagrees. While an and/or argument might not champion a win, in this case, the Court found it sufficient enough to consider the arguments regarding both of Harris's claims: Title VII and ADEA. As noted above, the City does not challenge the first three prongs of Harris's *prima facie* case. It contends Harris cannot demonstrate the fourth prong: he was discharged because of his age.

Wait testified in deposition that in twenty-eight years with the City, Harris "had not been adequately prepared or mentored, taught to be a leader, and to be able to dive into difficult problems." ECF No. 15-1 at 105 (103:11-13). "Harris had basically been left to go on his own as he grew up and as he promoted up. And he promoted up through the department through a variety of means, but a lot of it being in the right place at the right time." *Id.* (103:18-21). When Harris "struggled to engage and to learn more" Chief Hansen decided to "keep him as the assistant chief until, you know, his retirement, unless he made a choice to go somewhere else." *Id.* at 105 (103:24), 132-33 (130:21-131:2). Even though Harris had "a lot of experience with the

City," today's City of Schertz requires "a higher level of sophistication and a higher level of leadership to lead departments" because it has grown from 18,000 people in 2001 to "almost 50,000" by 2019. *Id.* at 105-107 (103:9-105:7). Taken as a whole, these comments are sufficiently troublesome to satisfy Harris's *prima facie* burden. Having established a *prima facie* case for his ADEA claim, Court looks to the City's proffered reason for termination and whether Harris proffers rebuttal evidence that establishes a genuine dispute for trial.

The City contends it terminated Harris because he had a "surreptitious" camera installed in a vent in order to surveille Animal Services employees; this eroded the trust of the City employees and its citizenry and violated City policy. ECF Nos. 15 at 9; 18 at 3; 15-1 at 127 (125:16-18). Harris denies the purpose of the camera was to surveille employees. ECF Nos. 17 at 20; 15-3 at 13 (16-19). He contends the reason proffered by the City is pretextual and the real reason for his termination was his age.

The evidence submitted by the parties on this issue includes the transcript of an interview of Harris conducted by Wait on May 31, 2017; the deposition of Harris, taken September 19, 2019; copies of invoices and emails; the deposition of HR Director Jessica Kurz; and the deposition of Executive Director Dudley Wait. ECF Nos. 15-1 (Wait deposition, emails, invoices); 15-2 (Harris deposition); 15-3 (transcript); 15-4 (Kurz deposition). The evidence shows that sometime between October and December of 2016, Harris contacted Director of Information Technology Myles Clauser ("Clauser") to discuss placing a camera in the lobby of Animal Services. ECF Nos. 15-2 at 39 (37:7-24); 15-3 at 5-6. It appears an incident with a lost dog, which involved "some turmoil within the lobby" of Animal Services, precipitated the conversation (all involved refer to the incident as the "Cantu incident" or "Cantu dog incident"). ECF Nos. 15-2 at 39 (37:7-24); 15-3 at 3, 5-6; 17-6 at 21, 55-56. Follow-on conversations

between Clauser and Harris included discussions about the placement of a kiosk for customers to input missing animal and other types of information and swipe card functionality that would allow creation of a record, which would indicate when and where employees were entering and exiting the building. ECF Nos. 15-2 at 43, 83-84; 15-3 at 4, 10, 15, 32-34.

On March 20, 2017, Tammy Lawrence ("Lawrence"), administrative assistant in the information technology division, emailed Bryan Heickman ("Heickman") of Clearcom Telecommunications, writing: "We are in need of some cabling at our Animal Adoption Center. Myles is updating the drawing today and I will send it to you, but *can* we get on the schedule please. It will be 3 data lines, no voice ...." ECF No. 15-1 at 162 (sent 10:09 AM). Heickman responded: "Tammy right now I have you scheduled for Friday morning first thing. . . . I'm assuming they open around 8 o'clock correct?" *Id.* at 162 (sent 11:52 AM). Lawrence responded: "8 am is good. Per Myles the cabling need to be ran [sic] to the front area vents (2)." *Id.* at 161 (sent 11:54 AM). Lawrence then emailed Harris at 1:56 PM writing: "A vendor will be out this Friday morning to the AAC to run the cabling. Let Myles know if you have any questions." *Id.* at 170. Harris responded: "Great, thanks." *Id.* (sent 3:11 PM, copied Clauser).

On March 24, 2017, Lawrence emailed Heickman writing: "this is a sensitive project so we don't want Animal [Services] staff knowing too much about this other than you are running cabling." *Id.* at 161 (sent 8:19 AM). On May 3, 2017, Lawrence emailed Ray Clark ("Clark") of LAN-COMM Technologies writing: "Please do not forget you have the camera install at the Animal Adoption Center today at 5:30 pm. [W]e need this completed." *Id.* at 158 (sent 1:57 PM). An invoice dated May 3, 2017, appears to note: "install covert camera in AC" in the "work required" section. ECF No. 15-1 at 157.[3] On May 17, 2017, Animal Services employees

---

[3] An email exchange between Clark and Clauser indicate the camera at Animal Services was not the first covert camera to be installed by the City. On February 24, 2017, Clark emailed Clauser, writing: "I think I did that tiny

discovered the camera, which had been installed inside a vent in the lobby. ECF No. 15-1 at 94 (92:13-22).[4]

Kurz testified that she did not know and could not say "with any certainty" if Harris "directed that the camera be placed in a vent to be concealed." ECF No. 15-4 at 62 (60:18-25). Wait testified that Harris told him the purpose of the camera was to "watch the employees to make sure they weren't leaving early and that they were remaining at the workplace for the full period they were being paid for. And so, then, once [the City] figured out what the camera was, we had our IT department who had installed it go uninstall it, and then we placed it into the PD property room for safekeeping." ECF No. 15-1 at 86-87 (85:24-85:6).[5] Wait further testified that Clauser confirmed that Harris asked for the camera to be concealed. *Id.* at 96-97.[6] Harris testified

---

[4] camera so covertly that I don't think I ever invoiced you for it." ECF No. 15-1 at 173-174 (sent 1:55 PM). Clauser replied: "It was billed as phone service." *Id.* at 173 (sent 2:07 PM). Contrary to the City's contention that no other hidden cameras existed on City property, in addition to the February invoice for a previously installed covert camera, the evidence submitted by the City alleges that there were hidden cameras in IT and finance. ECF Nos. 15-2 at 45; 15-3 at 19-20, 36. Notably, the City uses the existence of the hidden camera in IT to bolster their allegation that Harris knew the camera in Animal Services was to be installed in a covert manner and location. ECF No. 15-2 at 45-46. Harris denies this allegation. *Id.*

[4] Two days later, the City called O'Brien in to serve her notice of demotion. O'Brien resigned at that meeting. It is alleged that she was "very upset" about the camera, communicated the existence of the camera to news outlets and social media, and "uproar" ensued resulting in the involvement of the City Council and "one heck of a stir." *See* ECF Nos. 15-1 at 57:10-59:15; 148 (O'Brien demotion notice dated May 19, 2020); 150 (O'Brien letter of resignation); 107, 119 (media); 120 ("uproar"); 15-3 at 43-44 (City Council); 15-2 at 53, 61 (media, "upset," "stir").

[5] The City's policy manual, Section 2.3.7, entitled Workplace Monitoring, advised employees that their workplace activities can be monitored. This included personal belongings, work area, computer, and phone. ECF Nos. 15-4 at 74; 17-9 at 2. Schertz City Policy prohibited audio recording by one employee of a conversation with another employee: "Although the City has broad rights to monitor as outlined in this policy and policy 2.3.6, unless expressly authorized in writing by the City Manager or an assistant City Manager (or for Police employees unless in furtherance of an authorized criminal investigation), employees of the City may not tape-record any conversation they have with other City employees unless specifically authorized in writing by the other parties to the conversation or unless the recording is openly conducted by a Department head or supervisor to preserve the contents of a business meeting. Nothing in this paragraph shall limit the City's right to monitor telephone calls, e-mail messages and the like as specifically set forth in policies 2.3.6 and 2.3.7." ECF Nos. 15-1 at 112 (110:14-25); 17-9 at 2. It is undisputed that the camera that was installed did not have audio capabilities. Harris is not alleged to have installed the camera for the purpose of recording conversations between employees.

[6] Wait also testified that he had a statement or tape-recording of Clauser saying that Harris asked for the camera to be installed when employees were not in the building. ECF No. 15-1 at 97. The City did not include with its summary judgment evidence any written statement, transcribed interview, or deposition of Clauser.

that the purpose of the camera was to bring Animal Services up to the same standard as the police station, library, and other City buildings with cameras, to monitor the lobby and the cash register at Animal Services, and to provide additional security for employees, particularly in light of the Cantu dog incident. In other words, with a camera any crime or harassment against an employee would be recorded and any allegation made by a citizen regarding an employee could be confirmed or denied. Harris further testified that he did not know when IT installed the camera. He knew they were installing cable for the kiosk and camera, because Lawrence emailed him, but he had not been notified and did not know when the camera was installed. Harris denies requesting that the camera be hidden. ECF Nos. 15-2 at 38-53; 15-3.

The City states that it would have demoted Harris but for the placement of the camera. Wait testified: "If we had not had a camera placed – a hidden camera placed, the outcome was going to [be demotion]." ECF No. 15-1 at 138 (136:5-14). However, the evidence submitted by the City is insufficient to conclude that Harris directed Clauser to conceal the camera in the vent. Consequently, the evidence cited by the City in support of its reason for termination calls into question the reason the City proffered for terminating Harris. The Court read all the evidence submitted by the parties and found ample evidence of pretext. In short: the various reasons given by the City for termination are unworthy of credence because they are not supported by the evidence.[7] But to defeat summary judgment on his ADEA claim, Harris must point to evidence

---

[7] The City variously cites as sole reasons for termination: the placement of the camera; the outcome of the second investigation; the erosion of trust. The City alludes to negative media attention and pressure from the City Manager and Council as reason for the termination. *See, e.g.,* ECF Nos. 15-2 at 53 ("it caused one heck of a stir"); 15-3 at 44-45 ("city council was notified that the city manager's office was the one that put the camera up"). The June 2, 2017 termination letter states:

> Your dismissal is based upon the culmination of findings of the investigation of the Animal Services department initiated on January 18, 2017, and later extended to the Marshal's Office, with a formal Notice of Complaint served to you on March 24, 2017. A disciplinary conference was held on March 27, 2017. Prior to close out of this investigation, a second investigation was initiated based upon recent activities regarding the placement of a camera in a concealed location in the

capable of proving that "but for age discrimination, he would not have been terminated." *Williams v. Waste Mgmt.*, No. 19-10532, 2020 WL 3250980, at *6, 2020 U.S. App. LEXIS 18737, at *8-9 (5th Cir. 2020) (per curiam).

As noted above, Wait thought that Harris's skills and leadership abilities had not evolved with the changing needs of a growing city. ECF No. 15-1 at 106. Prior to his appointment as City Marshal, Police Chief Hansen's approach was to let Harris retire in place as Assistant Police Chief until he was ready to formally retire or "made a choice to go somewhere else." ECF Nos. 15-1 at 105 (103:24); 132-33 (130:21-131:2). The Court finds these statements troubling, but not dispositive. While the evidence casts doubt on the City's proffered reason for terminating Harris, he has not pointed to evidence on which a reasonable jury could conclude that he was fired because of his age. This is where Harris's and/or argument comes up short. In this case the evidence of pretext is ample but Harris fails to make the critical but-for causation—the connection between his termination and his age—that is necessary to survive summary judgment on his ADEA claim.

In reaching this conclusion, the Court relies on Harris's response and ADEA decisions issued by the Fifth Circuit. For example, in *Goudeau v. Nat'l Oilwell Varco, L.P.*, the court concluded that doubts about the reasons for termination "combined with ageist comments" would allow a reasonable jury to "conclude that age was the reason for the termination." 793

Animal Services building for the purposes of surveilling employees without their knowledge. A formal Notice of Complaint was served to you on May 26, 2017, and a disciplinary conference was held on May 31, 2017.

The findings of the first complaint include failure to correct serious misconduct of a subordinate, including actions and behaviors that violated the City's Harassment Policy.

The second investigation yielded a finding of serious misconduct as described above. These acts, separately or combined, could have had an adverse effect on the City, on the confidence of the public in the integrity of the City government and a substantial negative impact on the relationships of other employees.

ECF No. 15-1 at 155-56.

F.3d 470, 477 (5th Cir. 2015) (citations omitted). In Fifth Circuit courts, comments found to be ageist have been significantly less nuanced than the comments made here by Hansen and Wait. *See, .e.g., Goudeau*, 793 F.3d at 476 ("old fart"); *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 656 (5th Cir. 1996) ("old goat").

*Kelly v. Costco Wholesale Corp.* noted that the plaintiff's "membership in the same protected class as the supervisor bolsters the inference that age discrimination was not the reason for his termination." 632 F. App'x 779, 783 (5th Cir. 2015) (per curiam). *Kelly* cited *CSC Logic*, which found where the 58-year-old plaintiff was fired by his 60-year-old employer, there was an inference that "age discrimination was not the motive." 82 F.3d at 658. As the City points out in this case, Harris is a white male in his fifties who was fired by a white male in his fifties. Additionally, while O'Brien was not terminated (she chose resignation rather than demotion), Taylor was terminated. Both O'Brien and Taylor are significantly younger than Harris. These facts negate the inference that Harris was terminated because of his age.

In *Hervey v. Miss. Dep't of Educ.*, the court noted that, "even where plaintiff provides some evidence of pretext, our court has held the overall lack of any evidence of discriminatory intent is sufficient to defeat plaintiff's claim." 404 F. App'x 865, 868 (5th Cir. 2010) (per curiam) (internal quotation marks and citations omitted). In *West v. Nabors Drilling USA, Inc.*, the court noted that it is "possible for a plaintiff's evidence to permit a tenuous inference of pretext and yet be insufficient to support a reasonable inference of discrimination." 330 F.3d 379, 385 (5th Cir. 2003) (internal quotation marks and citation omitted). Here, Harris did not point to evidence of discriminatory intent based on age and the ageist comments in the record are too tenuous to prove up but-for causation.

**CONCLUSION**

For the reasons stated above, the Court GRANTS *Defendant City of Schertz's Motion for Summary Judgment* (ECF No. 15). This ruling disposes of all claims asserted in the operative complaint. Accordingly, the Court issues a final judgment pursuant to Fed. R. Civ. P. 58 contemporaneously with this Memorandum Opinion and Order.

It is so ORDERED.

SIGNED this 17th day of August 2020.

_____
JASON PULLIAM
UNITED STATES DISTRICT JUDGE